767 P.2d 1241

Gabriel THORNOCK, by his next friend and mother Lana (Thornock) BAUGH and Lana (Thornock) Baugh, Plaintiffs–Respondents,

v.

BOISE INDEPENDENT SCHOOL DIS-TRICT #1, Defendant–Appellant.

No. 16455.

Supreme Court of Idaho.

July 1, 1988.

Rehearing Denied Dec. 29, 1988.

Stewart A. Morris, Boise, for defendant-appellant.

J. Brent Marchbanks, CO–AD, Inc., Boise, for plaintiffs-respondents.

HUNTLEY, Justice.

This case presents three issues: (1) whether the district court employed the appropriate standard of review for an administrative proceeding under the Education for All Handicapped Children Act (EAHCA); (2) whether the Boise Independent School District fulfilled its legal obligation to offer Thornock a Free Appropriate Public Education (FAPE); (3) whether the school district's duty to provide a FAPE is obviated because of Thornock's parent's selection of private school placement for their son.

Gabriel Thornock, a multiply handicapped child, is the son of Lana Baugh and has been classified as "trainable mentally retarded." During the 1981–82 school year, Gabriel resided in the Meridian School District, where he was placed in the public school's "contained classroom," a class consisting solely of handicapped children taught by special education teachers. Gabriel's parents decided to place him in a private school to better attain social integration and achievement goals. All of the private schools contacted by his parents required that he have the assistance of a full time one-to-one aide. They enrolled him in St. Joseph's parochial school in the Boise School District for the 1982–83 school year.

Once Gabriel was enrolled in a private school, his parents started administrative proceedings to obtain reimbursement for the one-to-one aide.

Since Gabriel's legal residence was still in the Meridian School District, Meridian contracted with the Boise School District to provide special education services. In June 1983, the Thornocks changed their residence to the Boise School District. Gabriel's parents requested the Boise School District to provide special education related services including publicly funded services of a full time one-to-one aide.

On August 29, 1983, a Child Study Team (CST) meeting was convened to develop a program of special education related services and discuss the financial responsibility for the full time one-to-one aide.

The Boise Independent School District had been advised by its legal counsel that it was not financially responsible for the services of a full time one-to-one aide provided in a private school setting. On November 15, 1983, the Child Study Team meeting reconvened, meeting with Gabriel's parents to inform them of opportunities available to Gabriel through the public education system. The district made no offer to consider any placement other than in a segregated classroom for "special education" children. Gabriel's parents contended that he was entitled to receive "mainstreaming" under federal statute, that is, placement in a classroom with non-handicapped children. The district offered to pay for related ser-

vices in a private school, but would not pay for the full time one-to-one aide. However, Gabriel's parents chose to keep him in the private school setting and initiated administrative proceedings in which they sought reimbursement for the cost of the one-to-one aide and the tuition at the private school.

The hearing officer ruled in favor of the Boise Independent School District. The decision was appealed to the State Department of Education where the decision was affirmed. Gabriel next filed a petition in district court for judicial review of the administrative decision. The district court reversed and ruled in favor of Gabriel Thornock and the district now appeals.

## I.

█ We first address whether the district court applied the appropriate standard of review under the EAHCA.

In 20 U.S.C. § 1415(e)(2), Congress states that "the court shall receive the records of the administrative proceedings, shall hear additional evidence of the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

The school district, citing *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) claims that the district court's review is not a *de novo* review where the decision is based on the preponderance of the evidence. Rather, the district would impose an "implied limitation" on the court's review and require "due weight" to be given to the hearing officer's decision.

*Rowley, supra,* involved a student who was mainstreamed and received passing grades in the standard program of study. The dispute in *Rowley* was whether the district should be using federal money to provide the student with a deaf language interpreter. Given the court's holding that the student was receiving an appropriate

education, the court understandably stated that "courts must be careful to avoid imposing their view of preferable education methods upon the states." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051.

Unlike *Rowley*, the instant case does not involve a school district's choice between two appropriate educational alternatives. Rather, the question here is whether the education offered was appropriate at all. The district court did not abuse the preponderance of the evidence standard by measuring the educational policies of the school district against the Congressional requirements. The question before the district court was whether the education offered Thornock was appropriate.

*Rowley* required that due weight be given to the proceedings before the hearing officer. This would indicate that the evidence presented in the hearing be considered as much a part of the record as any proceedings before the district court as long as those proceedings comply with 20 U.S.C. § 1415. It does not imply that the hearing officer's findings and conclusions should rise beyond whatever persuasive value they have in the district court's decision on the merits.

In *Gregory K. v. Longview School Dist.*, 811 F.2d 1307 (9th Cir.1987), both the standard applicable to the trial court and that applicable to the appellate court in these cases was discussed. As to the deference to be given state administrative findings, the *Gregory* court noted:

> As the Supreme Court has held, courts must give "due weight" to judgments of education policy when they review state hearings under 20 U.S.C. § 1415(e). *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). Citing *Rowley*, we have held that "courts should not substitute their own notions of sound educational policy for those of the school authorities which they review." *Wilson v. Marana Unified School Dist.*, 735 F.2d 1178, 1183 (9th Cir.1984). How much deference to give

state educational agencies, however, is a matter for the discretion of the courts:

> The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.

*Town of Burlington v. Dept. of Ed.*, 736 F.2d 773, 792 (1st Cir.1984), aff'd, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

The district court in the instant case noted:

> [T]hat the school district's argument is irrelevant to the outcome of this case. The evidence in this case, unlike most cases, is clear and uncontroverted as to every relevant fact. By any standard of evidentiary review this Court's ruling would have to be the same as is herein announced.

The Boise School District put forth no evidence rebutting the substantial evidence that mainstreaming was appropriate for Gabriel.

As to this Court's standard of review, the Court in *Gregory, supra,* commented:

> The Court of Appeals reviews the district court's findings of fact for clear error. *Burlington Northern, Inc., v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir. 1983). "A finding of fact is deemed clearly erroneous when although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id.* Even where, as here, the district court relies on a written record of administrative proceedings, the clearly erroneous standard applies to findings of fact. *Id.*

The Court of Appeals reviews *de novo* the district court's conclusions of law. *Id.* Unless a mixed question of fact and law is primarily factual, we review mixed questions *de novo. United States v. McConney*, 728 F.2d 1195, 1199–1204 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). For example, whether the school district's proposed IEP was a "free appropriate public education" as required by the Education for all Handicapped Children Act is a mixed question that we review *de novo. Wilson v. Marana Unified School District*, 735 F.2d 1178, 1181 (9th Cir.1984); *Department of Education, State of Hawaii v. Katherine D.*, 727 F.2d 809, 814 n. 2 (9th Cir.1983), cert. denied, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985).

The district court followed the standard of review provided in 20 U.S.C. § 1415, and there is no showing that it violated the preponderance of evidence standard by finding that the education offered by the Boise School District was not appropriate.

## II.

With the appellate court standard of review enunciated in *Gregory, supra,* in mind, we now pass on to the major issue on appeal, which is whether the district court erred in ruling that the school district failed to offer Gabriel a FAPE. The purpose of the EAHCA is to make available to *all handicapped children* a free appropriate public education. 20 U.S.C. § 1400(c). A FAPE must be provided in the least restrive environment, and Congress has expressed a strong preference for mainstreaming handicapped children in non-handicapped educational settings. 20 U.S.C. § 1412(5)(B). Above all else, though, Congress recognized that handicapped children are unique and that placement decisions must be made on an individual basis, by a multidisciplinary team, according to a variety of criteria, not according solely to I.Q. or some other criterion. *See* 20 U.S.C. § 1412(5)(C) *and* 34 C.F.R. § 300.532. The

critical feature of any FAPE is that it must be in conformity with a handicapped child's "individual education program" (IEP). *See* 20 U.S.C. § 1401(18) (FAPE defined in terms of conformity with IEP).

The importance of the IEP cannot be understated. It is the decision-making document. Accordingly, an IEP must be in effect before special education and related services are provided to a child, and it must be implemented as soon as possible following the child study team meeting. 34 C.F. R. § 300.342(b). *See also,* 34 C.F.R. §§ 300.342–300.345 and IDAPA 08.02.E.15, 3.e, which explain the child study team. Further, the EAHCA mandates that each local educational agency "will establish, or revise, whichever is appropriate, an individualized education program for each handicapped child *at the beginning of each school year ...*" 20 U.S.C. § 1414(a)(5) (emphasis added).

Just what, then, must a valid IEP contain? The EAHCA provides the answer:

"The term 'individualized education program' means a written statement for each handicapped child *developed* in any meeting *by a representative of the local educational agency* or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved."

20 U.S.C. § 1401(19) (emphasis added). *See also* 34 C.F.R. §§ 300–340–300.349; and IDAPA 08.02.E.15, 3.h and i.

Presumably to assure compliance with the least restrictive environment requirement, the EAHCA and the federal regulations require that the IEP contain a statement of the extent to which the child will be able to participate in regular educational programs. *See* citations above. The Idaho regulations require, *inter alia,* a statement of:

"the extent to which the student will participate in the regular education program and assurance by the Child Study Team that all educational alternatives have been considered and that any special education and related services to be provided for the child will be in the least restrictive environment." IDAPA 08.02.- E.15, 3.h.v.(d).

The EAHCA makes clear that the fundamental prerequisite of any FAPE is a sufficient IEP. 20 U.S.C. § 1401(18). The legislative history and the commentators all indicate that the procedural aspects of the EAHCA are just as important as its substantive provisions, so the concern regarding the timing and the sufficiency of Gabriel's IEP is not mere quibbling.

The dispute between Gabriel's parents and the school district centers upon the extent to which mainstreaming is appropriate and feasible for Gabriel. In August of 1983, Gabriel's parents initiated discussions with the school district to have one-to-one services provided in a regular classroom. The hearing officer found that from the outset Gabriel's parents were committed to placement in St. Joseph's and that "[f]rom the outset, the district objected to public funding of the one-to-one individual aide for Gabriel in private placement." *See* Hearing Officer's "Findings, Conclusions, and Decision," pp. 9–10. Various letters in the record indicate that, though Gabriel's parents authorized the release of information concerning Gabriel to the school district for evaluation, and though Gabriel was also made available to the school dis-

trict for evaluation, no sufficient IEP was in effect for Gabriel at the beginning of the 1983–1984 school year.

■■■ A purported IEP was prepared by the school district on August 29, 1983, and another on November 11, 1983. Both documents suggest that the proper FAPE for Gabriel is physical and occupational therapy, and communication disorder services. However, neither document sets forth goals, objectives and "appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved" as required by 20 U.S.C. § 1401(19). Nor do they contain a statement of the extent to which Gabriel *"will be able* to participate in regular educational programs." 20 U.S.C. § 1401(19)(C) (emphasis added).[1] The necessity of this latter statement is made clear by 34 C.F.R. § 300.550(b):

"Each public agency shall insure:

"(1) That to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and

"(2) That special classes, separate schooling or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicapped is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

A mere conclusory statement that the child study team has selected the least restrictive environment is not enough. There must be a statement describing the handicapped child's *ability or inability* to participate in regular educational programs.

We do not hold that a new IEP must be prepared for each school year. But here,

the District utterly failed to tender any appropriate IEP for Gabriel.

In a letter to the District dated November 21, 1983, Gabriel's mother and attorney correctly informed the District that the District's latest offer of placement was not the "least restrictive" that would be "appropriate," and to initiate the due process hearing procedures to which they were entitled. At this point, the District was certainly obligated to tender a valid IEP. However, counsel for the District admits that, by that point, the District felt it owed no further obligation to the Thornocks. The District seemed to be operating from the erroneous premise that, regardless of the express mandate of 20 U.S.C. § 1412(5), in any given situation, the offering of an education for which the District at least partially paid (i.e. providing "comparable" Part B funded services) was all that was required of it. The District was *not* alone in its confusion, as the hearing officer also erroneously concluded that:

Under the provisions of the Act and the regulations applicable to this case, Boise School District is not obligated to provide to Petitioner a free appropriate public education. Rather, the District is required to provide an opportunity for equitable participation in Part B funded program benefits consistent with the number of eligible private school students and their needs.

(Hearing Officer's "Findings, Conclusions, and Decision," p. 13).

Because of the flaws in Gabriel's "IEPs," the district's failure to acknowledge the deficiencies of the IEPs it promulgated, its failure to develop an adequate IEP after receiving notice of its noncompliance with the EAHCA in the letter of November 21, 1983, and the obvious flaw in the "Findings, Conclusions and Decision" of the Hearing Officer (i.e. stating that Gabriel was not owed a Free Appropriate

---

1. The Idaho regulations only require a statement of the extent to which the child "will participate," not the extent to which the child "will be able to participate" in regular educational programs. IDAPA 08.02.E.15, 3.h.v.(d). In this regard, the Idaho regulations are contrary to the EAHCA, and the mandate of the EAHCA must control.

Public Education), we affirm the decision of the district court. Without a valid IEP there can be no FAPE, see 20 U.S.C. § 1401(18), and therefore 34 C.F.R. § 300.403(a) [2] indicates that reimbursement is appropriate.

While our holding that no adequate IEP was prepared obviates the need to address the proper definition of "appropriate education," we would like to provide some guidance in this area. 20 U.S.C. § 1412(5) requires all states to establish the following:

**Eligibility requirements.**

. . . .

(5) The state has established (a) procedural safeguards as required by § 1415 of this title, (b) procedures to assure that, *to the maximum extent appropriate,* handicapped children, including children of public or private institutions or other care facilities, are *educated with children who are not handicapped,* and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicapped is such that education in a regular class with the use of supplementary aides and services cannot be achieved satisfactorily, . . . (Emphasis added).

■ There is some confusion in applying the above section since the EAHCA covers all types of handicaps.[3] The school district interpreted § 1412(5) to apply only to physical handicaps. The school district bases its interpretation of the section on *Rowley, supra,* which referred to regular examination and yearly advancement from grade to grade as a factor to consider in determining whether the education being provided was appropriate. The school district concluded that *Rowley* meant that mainstreaming is only appropriate when the handicapped child can progress from grade to grade. However, the Supreme Court in *Rowley* confined its analysis to the factual setting of that specific case. To apply the school district's interpretation of *Rowley* would deprive most mentally handicapped students of the benefits of mainstreaming. The district court herein interpreted *Rowley* to mean, and we agree, that when a physically handicapped student is participating in a regular curriculum, is being educated with non-handicapped students, and is achieving passing grades, a strong presumption is made that the education provided is appropriate. *Rowley,* 458 U.S. at 202–204, 102 S.Ct. at 3049.

■ In adopting the EAHCA, Congress did not distinguish between physically and mentally handicapped. In addition, Congress has indicated a strong preference for mainstreaming *all* handicapped children.[4] Indeed, the language in 20 U.S.C. § 1415 indicates more than a mere preference for mainstreaming—but requires it "to the maximum extent appropriate." In *Wilson v. Marana Unified School Dist. of Pima*

---

**2.** 34 C.F.R. § 300.403(a) provides:
"If a handicapped child has available a free appropriate public education and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility. . . ."
34 C.F.R. § 300.403(a).

**3.** 20 U.S.C. § 1401(1) provides the definition for "handicapped children": (1) the term "handicapped children" means mentally retarded, hard of hearing, deaf, speech or languaged impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disability, who by reason thereof require special education and related services.

**4.** Senator Harrison Williams of New Jersey, a principal sponsor of the Act, emphasized the need for the education of *all* handicapped children:
While much progress has been made in the last few years, we can take no solace in that progress until *all* handicapped children are, in fact, receiving an education. (Emphasis added). The most recent statistics provided by the Bureau of Education for the handicapped estimate that . . . 1.75 million handicapped children do not receive any educational services, and 2.5 million handicapped children are not receiving an appropriate education. 121 Cong.Rec. 19486 (1975).

*County,* 735 F.2d 1178 (9th Cir.1984), the Ninth Circuit further interpreted the federal mandate to "mainstream to the maximum extent possible" as an important "policy which must be *balanced* with the primary objective of providing handicapped children with an 'appropriate education'." *Id.* at 1183. (Emphasis added). Therefore, mainstreaming is a major and important factor to be balanced in assessing an appropriate placement. Other factors of course include the child's emotional and intellectual make-up.

With this definition of an "appropriate education" as a foundation, we would also like to comment on the testimony presented at the evidentiary hearing by Boise School District.

■■■■ The school district argued that its segregated education was appropriate—an argument that is entirely irrelevant and superfluous to any discussion of the real issue in this case. The school district, in accepting federal funds provided under the EAHCA, has legally obligated itself to accept mainstreaming, "to the maximum extent appropriate," as a requirement of an appropriate education. In *Campbell v. Talladega County Board of Education,* 518 F.Supp. 47 (N.D.Ala.1981), the court noted that although the school district questioned the soundness of the mainstreaming approach to the education of the handicapped, by accepting federal funds, "the state of Alabama has bound itself to act in accordance with that philosophy." *Id.* at 55. In *Roncker v. Walter,* 700 F.2d

1058 (6th Cir.1983), the court stated: The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the act's mandate. *Id.* at 1063. By arguing that its segregated education is appropriate for Gabriel, the Boise School District has ignored what the Alabama Supreme Court and 6th Circuit recognized. Such arguments express only a basic disagreement with the Congressional intent that mainstreaming, to the maximum extent appropriate, is preferable to an appropriate segregated education.[5]

### III.

We next address the issue of whether the school district's duty to provide a Free Appropriate Public Education is obviated by the selection of a private school by Gabriel's parents. The Thornocks moved to the Boise Public School District weeks before the 1983–84 school year started and Gabriel had been enrolled in St. Joseph's School prior to the move. As the trial court noted, it would not have been reasonable to require them to abandon his placement at St. Joseph's School without an offer of an appropriate education elsewhere. 20 U.S.C. § 1415(e)(3) states that during the IEP review process "the child shall remain in the then current educational placement...."

■■■■ Congressional preference for continuity in placement, and the failure of the

---

**5.** Although not necessarily to our ruling in this case, we would like to comment on the district court ruling that one-to-one aide service was a necessary part of an appropriate education in Gabriel's case.

The evidence showed that Gabriel had been mainstreamed with the help of a full-time, one-to-one, teacher's aide. The school district did not attempt to combat the evidence that a full-time aide is necessary for mainstreaming, but rather it argued that it could not provide aide services with Part B funds because the district aides are paid through separate local funds.

*Mainstreaming* is a major and important factor in assessing an appropriate education. Related services which make mainstreaming possible should take priority over other related

services. The school district is correct in stating that Part B funds must supplement and not supplant locally funded programs, but there is nothing in the Act which precludes the use of Part B funds for aide services above those already provided by the school district. The Act states that Part B funds are to be used to provide additional services to handicapped children starting with the basic provision of a Free Appropriate Public Education.

Therefore, Part B funds may be used for aide services and must be used for aide services when they are necessary to the successful accomplishment of appropriate mainstreaming.

school district to offer Gabriel an appropriate education, gave his parents justification to maintain the St. Joseph's placement without waiving his right to a Free Appropriate Public Education. It seems that a significant consideration behind the hearing officer's decision was the fact that Gabriel's parents had unilaterally placed Gabriel in St. Joseph's, and that regardless of the educational program offered by the school district, it appeared Gabriel's parents would choose to keep Gabriel in St. Joseph's. Because of this, it seems the hearing officer and the school district might have believed the obligation of the school district to develop an IEP and provide a FAPE was somehow lessened. We would like to dispel any such notion.

The EAHCA vests the state educational agency with responsibility for carrying out its mandates:

"The State educational agency shall be responsible for assuring that the requirements of this part are carried out and that *all educational programs for handicapped children within the State,* including all such programs administered by any other State or local agency, *will be under the general supervision of the persons responsible for educational programs for handicapped children in the State educational agency* and shall meet educational standards of the State educational agency."

20 U.S.C. § 1412(6) (emphasis added).

A California court in *Nevada County Office of Educ. v. Super. of Pub. Instruction,* 149 Cal.App.3d 767, 197 Cal.Rptr. 152, 158 (1983), explains further:

"The intent of establishing a single line of responsibility is clear. Referring to the rule that the state education agency must bear ultimate responsibility, the comment to the EAHCA states, 'The Committee considers the establishment of single agency responsibility for assuring the right to education of all handicapped children of paramount importance. Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services delivered.... the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency.' (Sen.Rep. No. 94–168, 1st Sess., p. 24 (1975); 1975 U.S.Code Cong. & Admin.News, at p. 1448.)"

 The school district cannot abdicate its vital role merely because Gabriel is enrolled in a private school. The EAHCA requires the state to develop a plan setting forth policies to assure that *"all children residing in the state who are handicapped,* regardless of the severity of their handicap, and who are in need of special education and related services *are identified, located, and evaluated...."* 20 U.S.C. § 1412(2)(C) (emphasis added). Even if a child is placed in a private school unilaterally by his or her parents, the state educational agency must ensure that an IEP is developed and implemented for the child if the child "[i]s enrolled in a parochial or other private school and receives special education or related services from a public agency." 34 C.F.R. § 300.341(b)(2) [6]. Here, Gabriel was receiving special education from the school district while attending St. Joseph's, and therefore, the school district was required to develop or revise Gabriel's IEP and take steps to implement

6. The regulations also provide that after a child is placed in a private school, the public agency may permit the private school to initiate and conduct meetings to review and revise the child's IEP. 34 C.F.R. § 300.347(b)(1). However, a representative of the public agency must be involved in any decision concerning the child's IEP and must agree to any proposed changes in the program before those changes are implemented. 34 C.F.R. § 300.347(b)(2). The state educational agency is responsible ultimately for compliance with the EAHCA. 34 C.F.R. § 300.347(c).

it. The responsibility rested with the district, not St. Joseph's or Gabriel's parents.

The school district has an affirmative obligation to offer a Free Appropriate Public Education. If the burden were placed on the parents of handicapped children to solicit appropriate educational offers from the district, it would be possible for two handicapped children in identical circumstances to be given opposing benefits, the difference between the two being the willingness of one parent to force the school district to make an offer and the other parents' unwillingness to pursue such a course. We cannot imagine Congress intending such an inequitable result.

■■■■■ The district court correctly ruled that the school district has an affirmative duty to offer a Free Appropriate Public Education to all handicapped children. *Hawaii Department of Education v. Katherine D.*, 727 F.2d 809 (9th Cir.1983), cert. den., 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985).

By affirming the district court, we do not mean to denigrate the expertise of the school authorities for determination as to the appropriateness of various forms of education. Courts must consider the determinations of school authorities regarding the most appropriate form of education and courts must recognize that the school authorities may validly find mainstreaming inappropriate where the educational experience would/could not be productive or enriching to the student, or where it would disrupt the classroom.

Here, however, the school district failed to prepare a valid I.E.P., the necessary precursor to an offer of a FAPE, for the 1983–84 and 1984–85 school years. Additionally, the school district expressed a preference for its own system of segregated education, presented evidence of its efficacy and offered *no* rebuttal evidence regarding the appropriateness of mainstreaming for Gabriel. Having accepted federal funding under the EAHCA, the district is obligated to treat "mainstreaming," "to the maximum extent appropriate," as its preference.

The final question raised by the district is whether the school district can be ordered to reimburse Gabriel's parents for their expenses, namely tuition and full time one-to-one aide services incurred in providing him with the appropriate education the school district failed to offer him.

This question was resolved by the United States Supreme Court in *Burlington School Comm. v. Mass. Dept. of Educ.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985), where the court stated that "by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." As the court noted, by informing parents on the one hand that they correctly placed their child in an appropriate private placement rather than accept an inappropriate public placement, but also noting that they cannot be reimbursed for their expenditures which the school district should have paid, would be to hand them a "pyrrhic victory." See also, *Hudson by and Through Tyree v. Wilson*, 828 F.2d 1059 (4th Cir.1987). The school district did not develop and implement a sufficient IEP. Therefore, Gabriel was not offered a FAPE and the district court properly ordered that Gabriel's parents be reimbursed. That Gabriel was unilaterally placed in a private school by his parents did not obviate the school district's duty to develop and implement a sufficient IEP. Therefore, defendant Boise Independent School District No. 1 must reimburse plaintiffs for Gabriel's tuition at St. Joseph's School plus payments made to his one-to-one aides for the school years such benefits were denied.

The decision of the district court that Gabriel was not offered a FAPE is affirmed. The parties are hereby alerted to the fact that this decision is narrow in its scope in one respect, in that it does not preclude continued and future analysis as to the appropriate placement of Gabriel in the system in ensuing years, as the scope

of this decision is limited only to the placement which was developed as a result of the proceedings in 1983. Future child study team proceedings working toward the development of a valid IEP for Gabriel would not be prohibited by this opinion.[7] Costs to respondents. No attorney fees awarded.

BISTLINE and JOHNSON, JJ., concur.

SHEPARD, Chief Justice, dissenting.

The pivotal issue in this case is what is an "appropriate public education" for a particular child, and who the decision maker should be—the parents, the courts, or the public school educators. In this case the parents assert, and this court agrees, that this particular child can only gain an appropriate public education by placement in a regular classroom of non-handicapped students (mainstreaming) together with a full time one-to-one aide. The court concludes that such a procedure is mandated by federal legislation and regulations, and decisions of federal courts. On the other hand, the school district maintains that because of the handicaps of this particular child, an appropriate public education may only be gained by placement in a public school which provides a special classroom environment designed for a maximum learning experience for the child, and which also provides opportunities for interaction with non-handicapped children. I disagree with and dissent from the conclusions of the majority which override and supplant the decision of the educational specialists, both at the local and the state level, as to what is an appropriate public education for this particular child.

I regret the length of this dissent, but perceive it to be necessary because the majority opinion suffers so many serious flaws. I submit that the core question— what is an appropriate public education for this particular child?—must be examined in the light of the individual child. The majority opinion furnishes no such information, but rather attempts to apply principles of law in a vacuum. Hence, it provides no guidance whatsoever for future decisions of public educators. The majority opinion either overlooks or ignores the clear case law regarding the standard of appellate review in such cases. The majority erroneously holds that no individual education program was developed for this particular child. The record speaks otherwise. The majority's muddled process is confused and confusing in failing to state whether its ultimate result is required by (1) the alleged failure to develop an individual education program (IEP), or (2) whether reversal is required because of the failure of the school district to offer the mainstreaming educational process in accordance with the majority's perception of federal requirements. The majority also erroneously concludes that the school district breached a duty mandated by federal legislation, although the parents had placed the child in a private school.

The child, Gabriel, was born in 1973 with a portion of his brain missing, and with multiple other handicaps. The family resided within the Meridian school district and prior to November 1981 Gabriel was enrolled in that district's segregated facility for children identified as having severely or profoundly handicapping conditions. In November of 1981, Gabriel was enrolled in a private preschool in Meridian. In August, 1982, at the parents' request, the Boise school district began special education related services to Gabriel on a contract basis with the Meridian district for

---

7. In fact, some of the expert opinion testimony in the administrative hearings indicates that Gabriel's I.Q. and mental development is such that he cannot benefit by placement in a classroom of children of his age and that his presence in the classroom may be disruptive to the other students. The result reached in this opinion is premised upon the inadequate IEP.

The school district is not precluded from properly establishing its case in future proceedings. To do so it must comply with the conditions of the federal grants it accepts, one of those conditions being that in appropriate cases something more than a segregated classroom setting be considered and made available.

occupational therapy, physical therapy, and speech therapy. Testing was requested to determine Gabriel's level of functioning, and for recommendations for appropriate educational placement and planning. That report summarized previous evaluations dating back to November, 1977, as well as those tests currently administered. The then current evaluations included the Stanford Binet Intelligence Test, the Visual Motor Integration Test, Draw–A–Person, the Woodcock–Johnson Psyco–Educational Battery, and the AAMD Adaptive Behavior Scale.

Gabriel's intelligence quotient was determined to be 37. He functioned in the trainable mentally retarded category. Although his chronological age was then nine years and seven months, his mental age was three years and four months. Other tests indicated mental ages of between two and three years. Evidence indicated that the intellectual achievement of such a child may reach as high as six years of age. Gross motor skills were functioning at a two to three-year-old level, and indicated spasticity in all extremities. His speech and language skills were at an age level between 28 and 32 months, with one and two-word utterances.

In the fall of 1982 Gabriel's parents resided in the Meridian school district, but they had decided to enroll Gabriel in a parochial school located within the Boise school district and were making tuition payments to that institution. At that institution Gabriel was placed in a regular third grade classroom but the school required the assistance of a one-to-one aide.

All of the above evaluations of Gabriel were performed under the auspices of the Boise school district, and hence the Boise school district had an extensive knowledge of Gabriel's ability. In June, 1983, Gabriel's parents changed their residence to the Boise school district, and they requested the Boise district to pay the costs of special education-related services including the services of a full time one-to-one aide.

A "child study team" was convened and met in August and November of 1983 with Gabriel's parents. As a result, the Boise district offered to place Gabriel in a classroom for "special education" children. The parents contended that such proffered placement was inferior to that at the parochial school and that the district was required to place Gabriel in a "regular" classroom with the assistance of a full time one-to-one aide. The district offered to pay for special education services in the private school, but refused to pay for the full time one-to-one aide. At no time did the parents request that Gabriel be placed in the district's public schools.

The majority errs in its focus on what the district allegedly failed to do. IEPs were in place, and it is admitted that the district had the resources for and proffered a free appropriate public education. The only question is whether the district's proffer was "appropriate" absent the "mainstreaming" demanded by the parents.

Thereafter administrative proceedings were instituted wherein the parents sought reimbursement for the tuition at the private school and the cost of the one-to-one aide. In such administrative proceeding the hearing officer ruled in favor of the school district. That decision was appealed to the State Department of Education where the decision was affirmed. Judicial review was sought in the district court, which reversed and ruled in favor of parents.

Initially, it is my view that the district court erred in determining the appropriate standard of review under the Education For All Handicapped Children Act, 20 U.S.C. § 1400 *et seq.* The district court stated: "*Rowley* required that due weight be given to the proceedings before the hearing officer, not to the subsequent decision by the hearing officer." I disagree.

*Rowley* required that due weight be given to the proceedings before the hearing officer, not to the subsequent decision by the hearing officer. This would indicate that the evidence presented in

the hearing be considered as much a part of the record as any proceedings before the Court as long as those proceedings comply with 20 U.S.C. § 1415. (Tr., p. 67).

The due weight requirement is clearly spelled out in *School Board of Prince William County, Virginia v. Malone*, 762 F.2d 1210, 1217, 1218 (4th Cir.1985):

> The second issue raised by the School Board is whether the district court improperly gave deference to the *decision* of the state hearing officers....
>
> ... The district court ... viewed the decision of the state hearing officers, reviewing the *decision* of the School Board pursuant to federal and state statutes and regulations, as the *decision* to which deference was due.... [then quoting the language from *Rowley* at 102 S.Ct. 3051, the court continues] The district court properly gave due weight to the *results* of the state administrative proceedings. To give deference only to the decision of the School Board would render meaningless the entire process of administrative review. *Roncker on Behalf of Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir.1983), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983). That is certainly not a result contemplated by the Act. (emphasis added).

The United States Court of Appeals, First Circuit, in *Town of Burlington v. Department of Education, Commonwealth of Massachusetts*, 736 F.2d 773, 781, 791–92 (1st Cir.1984), *aff'd sub nom, Burlington School Committee v. Dept. of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), approached the due weight issue thus:

> The appellants urge as error the district court's refusal to give any weight to the hearing officer's determination that the Town violated numerous state substantive and procedural regulations plus several federal provisions in its handling of the child's special education....
>
> Because Congress intended courts to make bounded, independent decision—

bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court—the question of the weight due the administrative findings of fact must be left to the discretion of the trial court.... This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, *must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue.* After such consideration, the court is free to accept or reject the findings in part or in whole....

> Under the approach we have outlined, these *findings by the state hearing officer must be reviewed* as bearing on the federal right to an appropriate education *and must receive the court's specific consideration.* Further, because the hearing officer found the Town's proposed IEP invalid as a matter of state law, the district court should have circumscribed its review and accorded the state findings deference. (emphasis added).

That due weight should be given to the decision of the hearing officer, as well as to the proceedings before the officer, has also been recognized by the Appeals Court of Massachusetts in *School Committee of Franklin v. Commissioner of Education*, 17 Mass.App.Ct. 683, 462 N.E.2d 338, 345 (1984), *rev'd on other grounds*, 395 Mass. 800, 482 N.E.2d 796 (1985):

> ... the department's and the parents' principal remaining objection is that the judge did not give sufficient consideration to the agency record.... The objection finds little support in the judge's careful analysis of the weight to be accorded the agency record. The judge anticipated the holding in [*Rowley* ], reasoning that the requirement in § 1415(e)(2) that "the court shall receive the records of the administrative proceedings" implies that the agency *judg-*

*ment* be accorded weight. (emphasis added).

The ruling of the trial judge was affirmed.

In *Pascagoula Municipal Separate School District v. Doe*, 508 So.2d 1081, 1086 (Miss.1987), it was stated:

> The act ... allows the trial judge to exercise his discretion to entertain additional evidence in reviewing the hearing officer's *decision*. This ... does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of "additional." We are fortified in this interpretation because it structurally assists giving due weight to the administrative proceedings, as *Rowley* requires. (citations omitted, emphasis added).
>
> The trial court must make an independent ruling based upon a preponderance of the evidence, but the act contemplates that the source of the evidence generally will be the administrative hearing record ... Thus, the procedure followed by a trial court falls "something short of a trial de novo." (citations omitted).

Finally, in *Gregory K. v. Longview School Dist.*, 811 F.2d 1307 (9th Cir.1987), the standard applicable to both the trial court and the appellate court in these cases was discussed. As to the deference to be given state administrative findings, the *Gregory* court noted:

> As the Supreme Court has held, courts must give "due weight" to judgments of education policy when they review state hearings under 20 U.S.C. § 1415(e). *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). Citing *Rowley, we have held that "courts should not substitute their own notions of sound educational policy for those of the school authorities which they review."* *Wilson v. Marana Unified School Dist.*, 735 F.2d 1178, 1183 (9th Cir.1984). How much deference to give state educational agencies, however, is a matter for the discretion of the courts:

> The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. *This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue.* After such consideration, the court is free to accept or reject the findings in part or in whole.

*Town of Burlington v. Dept. of Ed.*, 736 F.2d 773, 792 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (emphasis added).

The aforementioned cases clearly require that due weight be given to both the proceedings before the hearing officer as well as the subsequent decision. The district court failed to give such due weight or consider or respond to the decision.

In refusing to consider the decision of the administrative hearing officer the following findings by the hearing officer were either ignored or not discussed:

7. By response dated August 24, 1983, Dr. Woychick confirmed that at the August 16, 1983 meeting the parents had indicated that they had already re-enrolled Gabriel in St. Joseph's third grade and had begun making tuition payments to St. Joseph's School. The consistent testimony at the hearing, and the documentary evidence introduced, indicate that Mrs. Baugh and her husband had decided on placement in St. Joseph's School. *At no time did Mr. and Mrs. Baugh make application to the District for public school placement.* In fact, the testimony of Mr. Baugh was that the family preferred and had selected a private setting with an individual aide, and would continue that placement so long as the family could afford it. Mr. Baugh stated that if the family could no longer afford pri-

vate placement with an individual aide, he and Mrs. Baugh would need to consider a public setting. *Mr. Baugh further testified on rebuttal that he informed the Boise District officials in the August, 1983 meeting that at some future point in time the family could run out of money, and would at that point have to consider public school placement.*

10. There is no dispute in this hearing as to whether or not the District can provide a free appropriate public education to Gabriel. *Mr. and Mrs. Baugh conceded that they had never questioned the ability, resources, and personnel available to the District to provide free appropriate public education to Gabriel.* Based on the testimony and evidence introduced at the hearing, *I find that the Boise School District could provide, and that Gabriel would have available to him, were he placed in the public schools, a free appropriate public education.* However, because Gabriel has been placed, by his parent and stepparent, into a private school, I find that the Boise District has not been required to, and has not been given the opportunity, to provide a free appropriate public education to Gabriel.[1]

Findings, Conclusions and Decision of Hearing Officer, pp. 6, 8, 9.

I submit that when the district court failed to consider and address the findings of the hearing officer, it did not follow the standard of review contained in 20 U.S.C. § 1415, as interpreted by *Rowley, supra.* To hold as does the majority would make a meaningless charade of all administrative proceedings. Hence, in my view the district court's decision is insupportable and should be reversed.

The majority opinion also concludes that the school district failed in its obligation to offer a free appropriate public education.

The purpose of the Act is to assure all handicapped children the right to a free appropriate education. 20 U.S.C. § 1412(1).

In an effort to define FAPE, the Supreme Court in *Rowley* first recognized the 20 U.S.C. § 1401(18) definition:

The term "free appropriate public education" means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided *in conformity with the individualized education program required under section 1414(a)(5)* of this title. (emphasis added).

The Court then adds this to the definition:

Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a "free appropriate public education" as defined by the Act. 102 S.Ct. at 3042.

A FAPE is tailored to the unique needs of the handicapped child by means of an individual education program (IEP) prepared by local education officials in conjunction with the child's parents. 20 U.S.C. §§ 1401(18), (19). The Act specifies the components of an IEP as follows:

The term "individualized education program" means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of,

---

[1]. The majority opinion has engaged in a crass lifting out of context in its suggestion that the hearing officer held that Gabriel was not entitled to a free public education. As the above findings make crystal clear, the language of the hearing officer was premised on the placement in a private school, and the district "had not been given an opportunity" but could have and would have provided a FAPE.

*specially designed instruction to meet the unique needs of handicapped children,* the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual ·goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19) (emphasis added). *See also* 34 C.F.R. §§ 300.340–300.349; and IDAPA 08.02.E.15, 3.h and i.

The United States Supreme Court in *Honig v. John Doe & Jack Smith,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), has characterized the "individualized educational program" as the primary vehicle for implementing Congressional goals, and as "the centerpiece of the statute's education delivery system for disabled children." The child study team concept is delineated in 34 C.F.R. § 300.342–300.345 and IDAPA 08.02.E.15.

Contrary to the assertions of the majority, the record herein contains four IEPs for Gabriel dated September 30, 1982, December 14, 1982, December 9, 1983, and January 12, 1984. The essential components of those four IEPs are similar. The evaluations done by the Boise Independent School District in the form of psychological, physical therapy, and speech language evaluations formed the basis of the "Present Level of Student Performance" section. The education goals are similar and repetitive, and include activities such as recognizing letters of the alphabet, writing the letters in his name, and identifying colors. Evaluation procedures and schedules for review

are noted on the IEPs. The "specific education services" are those provided by the Boise school district as outlined in programs designed especially for Gabriel, and include occupational therapy, physical therapy, and speech therapy.

It is asserted that all of the IEPs are deficient in that they fail to provide that mainstream placement in regular classrooms is appropriate for Gabriel. That assertion, of course, begs the question posed by the demands of the parents. They contend that the school district's proposed placement in a special education class with some limited interaction with non-handicapped children is by law inappropriate. The school district, on the other hand, contends that Gabriel's individualized education program is more appropriately delivered in that special class. Hence, the pivotal issue is whether the district's offer is appropriate under the Act, or whether in all cases mainstreaming is the *only* appropriate public education under the Act. The district court concluded that there is a preference for mainstreaming, and that such is a presumptive requirement of an appropriate public education under the Act, "thus absent evidence that the child cannot meet the academic requirements of his IEP in a mainstreamed environment, any non-mainstreamed placement is legally insufficient and cannot possibly constitute a free appropriate public education."

The record indicates that a Ph.D. psychologist, Christine Pickford, recommended that Gabriel be placed in a special education classroom because of her opinion that a trained special education teacher is required to provide appropriate programs. Concerning mainstreaming, she testified:

I also had some concerns that in the regular classroom the act of *mainstreaming ... is not necessarily beneficial to his optimum education and my concern about that is that Gabriel benefits most from systematic instruction.* And being in a classroom with other ... with 3rd grade students ... is normalized in that he's not surrounded by other

handicapped children, *however he also does not have the benefit of the precision teaching that would occur in a small classroom.* (Tr., at 64) (emphasis added).

The special education teacher of the class to which Gabriel would have been assigned, testified as to the extent of the "mainstreaming" contacts that special education children have with non-handicapped children. It should be noted that the district did not propose that Gabriel be placed in a segregated facility exclusively for mentally retarded children. Gabriel would have been placed in Franklin Elementary School in a special education classroom. He would have had interaction with non-handicapped children during lunch, recess, physical education, and other classes as he was able to handle them. As indicated in *Roncker,* 700 F.2d 1058 (6th Cir.1983), a child's FAPE as determined by his IEP must be structured to permit him to benefit from instruction. In the instant case it is asserted that Gabriel should be placed in a regular third grade classroom. There is no assertion that Gabriel would have benefitted by that regular instruction, but would benefit only from the assistance of the one-to-one aide. On the other hand, the school district asserts that Gabriel would only benefit from instruction by specially-trained teachers in the special education class.

I disagree with the conclusion of the district court which is essentially affirmed by the majority opinion here that mainstreaming of handicapped children is required.

The United States Supreme Court in *Rowley, supra,* stated: "The primary responsibility for formulating the education to be afforded a handicapped child, *and for choosing the educational method most suitable to the child's needs,* was left by the Act to state and local educational agencies in cooperation with the [child's] parents." *Rowley, supra,* 102 S.Ct. at 3051. The *Rowley* court also stated: "The Act's use of the word 'appropriate' [reflects] Congress' recognition that some settings

simply are not suitable environments for the participation of some handicapped children." *Rowley, supra,* 102 S.Ct. at 3046, n. 21. At 102 S.Ct. page 3049 the *Rowley* court indicated that mainstreaming is preferred (not required) and states:

> Insofar as a State is required to provide a handicapped child with a "free appropriate public education," we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, *and must comport with the child's IEP.* [Emphasis added.] In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, *if the child is being educated in the regular classrooms of the public educational system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.* (emphasis added).

Hence, I would hold that while the Act requires that handicapped children receive specialized education, it does not necessarily require "mainstreaming" in cases where the child would receive no educational benefits therefrom. *See Roncker, supra; Gregory,* 811 F.2d 1307 (9th Cir.1987).

As stated in *Wilson v. Marana Unified School District No. 6 of Pima County,* 735 F.2d 1178 (9th Cir.1984):

> We are well aware of the importance of this [mainstreaming] policy; however, *it is a policy which must be balanced with the primary objective of providing handicapped children with an "appropriate" education.* See *Johnston by Johnston v. Ann Arbor Public Schools,* 569 F.Supp. 1502, 1508–09 (E.D.Mich. 1983) (*transferring child from a regular classroom to a special education classroom does not violate the EAH-*

*CA's goal of mainstreaming so long as special education is necessary and appropriate*). See also *Rowley*, 458 U.S. at 181, n. 4, 102 S.Ct. at 3038, n. 4. (emphasis added).

In *Mark A, v. Grant Wood Area Education Agency*, 795 F.2d 52 (8th Cir.1986), the court stated:

> We reject the view that the mainstreaming provisions of the Act are satisfied only if a handicapped child is educated *in the same classroom* with nonhandicapped children. *Springdale School District # 50 v. Grace*, 693 F.2d 41, 43 (8th Cir.1982). Alleah, at the very least will be educated *in the same school* with nonhandicapped children. (emphasis original).

The court in *Rowley* stated: "The primary responsibility for formulating the education to be accorded a handicapped child, and *for choosing the educational method most suitable to the child's needs* was left by the Act to state and local educational agencies in cooperation with the parents." 458 U.S. at 207, 102 S.Ct. at 3051 (emphasis added).

The majority provides no insight into any "evidence" presented to the district court which amplified, modified, or contradicted any evidence presented at the administrative hearing. In fact, no evidence was presented before the district court, and hence, the district court had only the transcript of the testimony presented at the administrative hearing.

The evidence at the administrative hearing, contrary to the assertions of the majority, supports the findings of the hearing officer that IEPs were developed for Gabriel, and that based thereon the district developed a free appropriate public education program for Gabriel. That FAPE was declined by Gabriel's parents.

The majority opinion states: "The school district argued that its segregated education was appropriate—an argument that is entirely irrelevant and superfluous to any discussion of the real issue in this case." In my view that statement of the majority is clearly erroneous, and results in its subsequent and murky attempted analysis. The crux of the case is indeed whether the program tendered by the district was "appropriate." If that which was tendered by the district was not appropriate, the majority is correct. The majority arrogates to itself, as did the district judge, the authority to substitute its judgment for that of the local school and state educators as to what is, or is not, an appropriate education for this particular child. Such action by the majority flies squarely in the face of the strictures laid down by the United States Supreme Court in *Rowley*.

The evidence tendered at the administrative hearing indicates that a free appropriate public education was tendered by the school district. As noted by the hearing officer, the parents "conceded that they had never questioned the ability, resources, and personnel available to the district to provide free appropriate public education to Gabriel." Thus, the hearing officer concluded that the district "could provide, and that Gabriel would have available to him, were he placed in the public schools, a free appropriate public education."

The majority opinion states at page 476, 767 P.2d at 1251:

> By affirming the district court, we do not mean to denigrate the expertise of the school authorities for determination as to the appropriateness of various forms of education. Courts must consider the determinations of school authorities regarding the most appropriate form of education and courts must recognize that the school authorities may validly find mainstreaming inappropriate where the educational experience would/could not be productive or enriching to the student, or where it would disrupt the classroom.

I suggest that such statement is a correct view, but in the instant case the Court has failed to apply it, and in fact has overturned the determinations of the school authorities regarding the most appropriate form of education. The district court and

this Court have substituted their judgments as to the most appropriate form of education for this particular child.

From that point on the majority's opinion slides off into murky waters inevidently holding that the district failed in its responsibilities for an IEP, and an offer of a FAPE. The opinion of the majority utterly fails to discuss the validity or invalidity of the IEP or the FAPE except as to the factor of mainstreaming. As to mainstreaming, the Court in the above quotation recognized its responsibility as per *Rowley* to refrain from substituting its judgment for the expertise of the local and state education authorities for determination as to the appropriateness of the various forms of education, and that the school authorities may validly find mainstreaming inappropriate. In the instant case the school authorities determined that mainstreaming full time in a regular classroom would not be appropriate for Gabriel. The evidence is clear that such determination was made on the basis that Gabriel's needs would be best served in a special class conducted by teachers specially educated, trained, and possessing expertise in the education of mentally handicapped children.

As enunciated by the majority, and clearly held by the previously-cited authorities, mainstreaming is not appropriate for every child under all circumstances. In the instant case the only evidence before the district court and this Court is that full time mainstreaming was not appropriate for Gabriel. The majority opinion faults the school district and bases its decision on the district's alleged failure to provide a valid IEP, and hence an offer of a FAPE. The harsh facts of the case are these. At that time Gabriel, while of a chronological age of more than eight years, functioned at best at a pre-school level. He had a lack of comprehension of the academic subjects offered in a third grade classroom. Whether it be at the parochial school or the Boise public schools, Gabriel's education was to consist of identification of colors, identifica-

tion of letters, increasing speech utterances to beyond one or two words, and a control of disruptive or abusive behavior. Hence, placement in a regular third grade classroom would be essentially a warehousing process with the exception of any training from a one-to-one aide, who would not be a trained and licensed teacher, much less one trained in educating handicapped children. The crux of the matter is whether such a warehousing situation is best for Gabriel, or whether he will be better served by the proposal of the district.

The district made its decision based on its view of the best placement for Gabriel, and tendered such a program. Gabriel's parents unilaterally rejected such a proposal, deciding rather to continue the third grade regular classroom experience in the parochial school. There is no argument that the school district could override the decision of the parents. However, the fact that the parents placed Gabriel in a private school does not serve to demonstrate that the decision of the school district was erroneous.

As previously discussed herein, the school district engaged in voluminous testing and evaluation to determine the abilities and capacity of Gabriel. Using a valid IEP based on those abilities and capacity, the district proffered a free appropriate public education. The proffer was refused by Gabriel's parents who opted instead to retain Gabriel in the parochial school program. There is no assertion, much less a showing, that the district acted arbitrarily, capriciously or with any intent to deprive Gabriel of a free appropriate public education. The record clearly demonstrates that the parents refused to accept the district's decision as to what was "appropriate" education for Gabriel, refused the proffer of the district, and placed him in a private institution.

Since in my view the district offered a free appropriate public education, the district had no responsibility to provide funding for an education which was not appropriate. The district, in effect, tendered fi-

**486**

nancial assistance for all portions of Gabriel's education in the private parochial school except that part relating to the one-to-one aide. As noted herein, the *total* funding for the parochial school program has been continued during the course of this appeal. It is now the year 1988, the matter should be resolved, and guidance should be given to the public school educators in this state. I would reverse the decision of the district court, and reinstate the decisions of the administrative agencies.

BAKES, J., concurs.