BURLINGTON NORTHERN, INC., a Delaware corporation, Plaintiff-Appellant,

v.

WEYERHAEUSER COMPANY, a Washington corporation, Defendant-Appellee.

No. 82–3598.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 1983.

Decided Oct. 25, 1983.

George C. Inman, Jr., Seattle, Wash., for plaintiff-appellant.

William A. Helsell, Helsell, Fetterman & Martin, et al., Seattle, Wash., for defendant-appellee.

Before KILKENNY and FLETCHER, Circuit Judges, and JAMESON, District Judge.*

KILKENNY, Circuit Judge:

Burlington Northern appeals from an order of the district court dismissing its action against Weyerhaeuser. It claims that Weyerhaeuser should have paid interstate tariff rates on certain rail shipments of logs transported between April 26, 1976, and December 31, 1978. These shipments took place entirely within Washington. Burlington Northern contends that it was actually the first leg of continuing transportation to the Orient in foreign commerce. The district court held that the shipments were intrastate and, therefore, Weyerhaeuser had paid the proper intrastate tariff rates. We affirm.

## FACTS

Burlington Northern transported approximately 39,000 million board feet (MBF) of Weyerhaeuser logs, 3,749 rail carloads, during the subject period. These shipments originated at Weyerhaeuser's inland sort yards throughout Washington and were destined for its Tacoma, Washington sort yard (TSY). Burlington Northern initially billed Weyerhaeuser at intrastate tariff rates. Later, upon learning that the Interstate Commerce Commission (ICC) was investigating the shipments, Burlington Northern rebilled Weyerhaeuser at the interstate tariff rates. Weyerhaeuser refused to pay the additional amount.[1]

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. The additional amount billed to Weyerhaeuser, which represented the difference between interstate and intrastate tariff rates on the subject shipments, was approximately $400,000.

TSY is primarily utilized for sorting, scaling and loading logs onto ships destined for the Orient. The record indicates that the facility is also used as a marshaling center where logs are delivered for further transshipment to other Weyerhaeuser mills. During the subject period logs were transported by six different methods.[2] Burlington Northern's shipments accounted for only a small percentage of the total volume of logs delivered to TSY.[3] In fact, during this period Weyerhaeuser exported 913,624 MBF of logs from its TSY facility. In addition, it transshipped 48,391 MBF from TSY to other Weyerhaeuser mills in Washington. The evidence indicates that more logs were transshipped within Washington each year than delivered to TSY by Burlington Northern.

During transportation from the inland sort yards to TSY the logs remained under Weyerhaeuser's complete control. Title did not pass to export purchasers until after the logs had arrived at TSY and were later delivered to their ships.[4] Prior to that time Weyerhaeuser maintained absolute control and power to divert logs to any uses in the best interest of the company.

Upon arriving at TSY logs were turned over to Puget Sound Bureau scalers. The scalers, who were not Weyerhaeuser employees, sorted the logs according to Bureau standards to determine which were suitable for export. Some export quality logs were subsequently de-barked. This process began in December, 1977. Weyerhaeuser discovered that de-barking increased the volume of logs that could be loaded onto ships. The bark was converted into a new product, beauty bark, and sold locally. Approximately one-third of all logs delivered to TSY during the subject period were de-barked.

Export quality logs were eventually loaded onto arriving ships, which called on TSY during this period at an average of eight per month. Approximately 90 percent of these ships were loaded pursuant to long-term contracts. Burlington Northern contends that these contracts were firm commitments that obligated Weyerhaeuser to deliver logs to TSY at regular intervals to accommodate scheduled ship arrivals. Consequently, when the logs left the inland sort yards destined for TSY they had already embarked on the first leg of continuing transportation to the Orient. Weyerhaeuser maintains that the contracts did not obligate it to deliver any of the logs transported by Burlington Northern to TSY for exportation. Furthermore, that their final destination was uncertain until sometime after the logs arrived at TSY.

On February 10, 1982, Weyerhaeuser moved for summary judgment. The district court denied the motion, ruling that there existed a factual question regarding Weyerhaeuser's intentions when it shipped logs from the inland sort yards to TSY. The court suggested that it read the depositions and other pretrial materials and render a decision on the merits. Both parties agreed. After further consideration, the district court held that the shipments were intrastate in nature. It based its decision primarily on the fact that Weyerhaeuser retained absolute control of the logs until after they had arrived at TSY. It held that

> [b]ecause of this element of unqualified ownership and unrestrained power to direct and divert the logs to whatever use [Weyerhaeuser] might elect after their arrival at TSY, and notwithstanding any generalized intention that the logs might be shipped abroad after their arrival in Tacoma, the court finds that the ship-

2. In addition to Burlington Northern, Weyerhaeuser transported logs to TSY by Milwaukee Railroad movements, transportation in trucks owned by Weyerhaeuser, transportation in trucks owned by other parties, deliveries by logging contractors, and rafts.

3. The Burlington Northern rail shipments accounted for only 12.9 percent of the logs

moved to TSY between May and December of 1976, 1.9 percent in 1977, and 1.6 percent in 1978.

4. Title passed to export purchasers on 80 percent of the logs free along side (F.A.S.) their ships. On the remaining 20 percent title passed free on board (F.O.B.) their ships.

ments from the sort yards in the woods were intrastate shipments.

## ISSUE

The sole issue on appeal is whether the district court correctly determined that the log shipments were not in interstate commerce within the meaning of the Interstate Commerce Act, 49 U.S.C. § 1001 *et seq.*

## STANDARD OF REVIEW

■ This case involves a combination of disputed factual findings and conclusions of law. We are free to review the district court's conclusions of law. *See Hoptowit v. Ray*, 682 F.2d 1237, 1245 (CA9 1982). However, findings of fact can be overturned only when clearly erroneous. FRCivP 52(a); *See Hoptowit*, at 1245. A finding of fact is deemed clearly erroneous when although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d 531, 539 (CA9 1982).

■ Burlington Northern's contention that a "more careful scrutiny" should be applied in this case is meritless. It is well established that the clearly erroneous standard of review applies to findings of fact even when the district court relies solely on a written record. *See Nicholson v. Board of Education*, 682 F.2d 858, 864 n. 6 (CA9 1982); *United States v. Mountain States Construction Company*, 588 F.2d 259, 264 n. 5 (CA9 1978); *Lundgren v. Freeman*, 307 F.2d 104, 115 (CA9 1962).

## DISCUSSION

### I. Disputed Factual Findings.

At the outset we must consider Burlington Northern's contention that the district court based its ultimate decision, in part, upon erroneous factual findings. In particular, Burlington Northern claims that (1) Weyerhaeuser specifically intended at the inland sort yards to export all logs transported to TSY; and (2) Weyerhaeuser's long-term contracts obligated it to trans-port the subject rail shipments to TSY for exportation on arriving ships.

■ The record contains substantial evidence to support the district court's determination that Weyerhaeuser did not have the requisite fixed and specific intent at the inland sort yards to export all logs transported to TSY. The evidence consists mainly of deposition testimony given by Weyerhaeuser employees involved at the management level with the transportation and processing of logs for Weyerhaeuser. The employees stated that most, but not all, of the logs transported to TSY were generally intended for probable export sale. However, they also indicated that some logs were sent to TSY with the intent that they would likely be transshipped to other Weyerhaeuser mills.

The statements given by Weyerhaeuser's Export Log Marketing Manager fairly summarize those of other employees deposed. He stated that

[t]he Tacoma Sort Yard ... is a distribution or marshaling yard for Weyerhaeuser logs. It receives its logs from wood yards, and logging sites ... Most, but not all, of the logs shipped to Tacoma are intended for probable export sale. Some logs are sent to Tacoma with the intent that they will likely be transshipped to another Weyerhaeuser facility for manufacture into various forest products.... No log that is sent to Tacoma is irrevocably committed to a specific end use at the time it is shipped from the woods. Weyerhaeuser owns and controls all the logs at Tacoma and has the freedom to dispose of them in any manner that is in the best interest of the company. Our export customers have no interest in, or right to, any log until Weyerhaeuser delivers it to the vessel.

We find nothing in the record to show that Weyerhaeuser had a fixed and specific intent to export any particular logs that were transported by Burlington Northern to TSY during the subject period. It is clear that Weyerhaeuser generally expected to export most of the logs delivered to TSY,

but the final destination—intrastate, interstate or foreign—was uncertain until after the logs arrived at TSY. Moreover, we reject Burlington Northern's claim that Weyerhaeuser's long-term contracts require a contrary result.

After a careful review of the long-term contract before us, we are convinced that it did not obligate Weyerhaeuser to deliver any particular logs to TSY for exportation.[5] The terms of the contracts required Weyerhaeuser to supply arriving ships with a pre-arranged volume of logs for export at a negotiated price.[6] Scheduled ship arrivals and advance notice requirements kept the company apprised of the volume of logs needed at TSY during any given period of time. However, Weyerhaeuser retained absolute control over the logs until after they arrived at TSY, including the power to divert the logs to any other use. The export purchasers had no interest in the logs until they were delivered to their ships.

Weyerhaeuser was not required to supply logs from any particular inland sort yard. It could send logs to TSY to meet contractual obligations from any of its facilities, and could deliver the logs by any of the six methods then being utilized. The record does not support Burlington Northern's contention that the particular logs it transported to TSY were unequivocally committed to fulfilling Weyerhaeuser's long-term contracts. Burlington Northern's shipments accounted for only 12.9 percent of the total volume of logs transported to TSY between May and December of 1976, 1.9 percent in 1977, and 1.6 percent in 1978. Because of this small percentage, and the fact that more logs were transshipped intrastate during each year than were delivered to TSY

by Burlington Northern, it would be mere speculation to conclude that the logs transported by Burlington Northern had been previously committed to export. Accordingly, we hold that the district court was within its discretion in finding that Weyerhaeuser's long-term contracts did not obligate it to transport the logs delivered by Burlington Northern to TSY for exportation on arriving ships.

*II. Applicable Law.*

In *Southern Pacific Transportation Co. v. ICC,* 565 F.2d 615 (CA9 1977), we recognized that

> [w]hether transportation is interstate or intrastate is determined by the essential character of the commerce, *manifested by shipper's fixed and persisting transportation intent at the time of the shipment,* and is ascertained from all of the facts and circumstances surrounding the transportation.

*Id.* at 617 (emphasis in original) (quoting *Southern Pacific Transportation Co.—Investigation of Operations,* 120 M.C.C. 236, 242 (1974)).

Contrary to Burlington Northern's contention, we find the facts in *Southern Pacific* very similar to those in the instant case. The Del Monte Company had shipped canned goods from its canneries in San Jose and Emeryville, California to its warehouse in Stockton, California. During these intrastate shipments Del Monte retained absolute control over the canned goods. Most of the canned goods were later shipped from the warehouse in interstate or foreign commerce. However, their final destination was uncertain until after the canned goods

---

**5.** Although the district court may have erred in holding that Weyerhaeuser's long-term contracts were more in the nature of planning documents than firm commitments, here the terms of the long-term contracts were clear, unambiguous and required firm commitments by both parties. However, the error of the district court is harmless because the contracts did not obligate Weyerhaeuser to deliver any particular logs transported by Burlington Northern to TSY for export.

**6.** A typical contract provides, *inter alia,* an agreement between the parties for the sale of a quantity of logs over a fixed period of time, usually one to three years. The volume of logs is fixed, but quarterly fluctuations are allowed provided a certain volume of logs is acquired annually. The price is determined initially by mutual agreement, but may be renegotiated quarterly upon request. If the parties cannot agree on a price for any two consecutive periods then either party may terminate the agreement.

were delivered to the warehouse. The ICC ordered Del Monte to pay interstate tariff rates on the shipments because most of the canned goods eventually ended up in interstate commerce. We reversed, setting aside the order.

Considering the circumstances surrounding the transportation, we held that "the only intent manifested by [Del Monte] . . . at the time of shipment . . . was to ship the goods to the warehouse for eventual transshipment to as an yet unknown destination. . . ." 565 F.2d at 617. In reaching our conclusion we emphasized that

[w]hile it is true that nearly all of the canned goods shipped to the Stockton warehouse eventually moved to interstate and foreign destinations, that expectation is not sufficient to supply the requisite "fixed and persisting transportation intent at the time of the shipment." . . . It is not disputed that Del Monte . . . did not decide the final destination of any shipment of goods until after the goods had come to rest in the Stockton warehouse. The fact that most of the goods in the warehouse were eventually shipped to interstate and foreign destinations is not sufficient to give rise to a fixed intent to engage in an interstate movement at the time the goods left the canning plants with their final destination still unknown. Inasmuch as the goods remained under Del Monte's control at the Stockton warehouse and were not committed to a common carrier for an interstate movement until they left that warehouse, the requisite intent which governs the character of the movement was not formed until shipment from Stockton.

*Id.* at 618.

The above principles are in accord with the Supreme Court's earlier decision in *Coe v. Errol,* 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715 (1886). In *Coe,* logs had been cut down in New Hampshire forests and delivered to Errol, New Hampshire for floating down the river to Lewiston, Maine. New Hampshire attempted to assess a property tax on the logs awaiting transportation to Errol. The shipper argued that the logs had al-

ready entered into interstate commerce and, thus, could not be taxed by the state. The Supreme Court disagreed and set forth several important principles for determining when goods have embarked on their journey in interstate commerce. The Court stated:

Whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between States has commenced. But this movement does not begin until the articles have been shipped or started for transportation from one State to another. *The carrying of them in carts or vehicles, or even floating them, to the depot where the journey is to commence is no part of that journey.* That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another State, or committed to a common carrier for transportation to such State, its destination is not fixed and certain. It may be sold or otherwise disposed of within the State, and never put in the course of transportation out of the State. *Carrying it from the farm, or the forest, to the depot, is only an interior movement of property, entirely within the State, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself.*

*Id.* at 528, 6 S.Ct. at 479 (emphasis supplied).

Burlington Northern relies on a line of cases which are clearly distinguishable. In these cases, the parties had obligated themselves in such a manner that the wholly intrastate segment was merely a part of "continuing transportation" in interstate or foreign commerce. *See, e.g., Hughes Bros. Timber Co. v. Minnesota,* 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359 (1926); *Texas N.O.R. Co. v. Sabine Tram Co.,* 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913); *Long Beach Banana Dist. v. Atchison, T. & S.F. Ry. Co.,* 407 F.2d 1173 (CA9 1969).

In *Sabine Tram, supra,* lumber was shipped from the Sabine Tram Company's mill in Ruliff, Texas to the port town of Sabine, Texas pursuant to a sales contract with the Powell Company. The Powell Company was engaged in the business of exporting lumber to Europe. The contract provided for delivery at Sabine, but all freight charges were paid by the Powell Company. Upon arrival at Sabine, the lumber was unloaded at the docks and placed in the water within reach of the ship's tackle, ready for loading onto the ship for transportation to Europe. It was apparent that at the time the lumber left Ruliff it had embarked on its ultimate journey to Europe, especially since the Sabine Tram Company had no facilities in Sabine and conducted no local trade in the area. Under these circumstances, the Supreme Court reasoned that the entirely intrastate transportation between Ruliff and Sabine was "but a step in its transportation to its real and ultimate destination in foreign commerce." 227 U.S. at 126, 33 S.Ct. at 234.

Likewise, in *Long Beach Banana, supra,* the circumstances warranted a determination that the wholly intrastate segment of transportation was not distinct from the foreign transportation. Bananas grown in Central America were shipped to the United States for importation at the Ports of San Francisco and Los Angeles. When the bananas arrived at the respective ports they were immediately loaded into rail cars for continuing transportation. The importers had always intended that the bananas would be destined for places beyond the port of entry. Bananas that had already been sold were immediately moved on to wholesalers. The remainder were held aboard the rail cars until sold, or were started on their way pending sale in transit. The purchasers paid all transit charges. This court upheld the charging of interstate tariff rates in this case because the intrastate shipments were not distinct from the foreign commerce. The essential character of the transportation was foreign.

■ In this case, however, we are not confronted with one continuous transportation in interstate or foreign commerce. On the contrary, the intrastate transportation of logs from the inland sort yards to TSY was merely an interior movement, separate and distinct from the ultimate transportation to a final destination, undertaken for the purpose of preparing the logs for final disposition. The facilities at TSY are utilized as a marshaling or distribution center for Weyerhaeuser logs, serving much the same function as a warehouse. While Weyerhaeuser generally expected to export most of the logs delivered to TSY, it also expected to transship some of them to other Weyerhaeuser facilities intrastate. Weyerhaeuser could not designate with certainty at the inland sort yards which logs would eventually be exported because independent Puget Sound Bureau scalers made the final determination based on quality standards. Therefore, when the logs left the inland sort yards their ultimate destination was still unknown.

Under these circumstances, the principles set forth in *Southern Pacific* govern our determination. The only intent manifested by Weyerhaeuser at the time of shipment from the inland sort yards was to deliver the logs to TSY for eventual reshipment to an as yet unknown destination. At that point, the logs had not yet embarked on a journey in interstate or foreign commerce. Accordingly, the essential character of the transportation was intrastate and Weyerhaeuser was initially billed at the proper intrastate tariff rates.

## CONCLUSION

The judgment of the district court is AFFIRMED.