**CONSOLIDATED RAIL CORPORATION,**
Plaintiff,

v.

**ACF INDUSTRIES, INC., Defendant.**

No. 88 C 8875.

United States District Court,
N.D. Illinois, E.D.

Oct. 29, 1990.

Richard M. Kates, Chicago, Ill., for plaintiff.

Stephen Herman, Thomas McFarland, Jr., Harold Spencer, Belnap, Spencer, McFarland, Emrich & Herman, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Consolidated Rail Corporation ("Conrail") filed an Amended Complaint against ACF Industries, Inc. ("ACF"), charging that ACF owes Conrail $29,378.47 in freight charges for the transportation of 22 empty cars owned by ACF. ACF now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56.[1] For the reasons stated in this memorandum opinion and order, ACF's motion is granted in principal part and denied to a minor extent (as to which judgment will be entered in Conrail's favor).

*Facts and Procedural History* [2]

ACF is a corporation that manufactures, sells, owns and leases rail cars. It leases railroad tracks at Granite City, Illinois, where it inspects, processes and stores cars awaiting future disposition—either by further lease assignment or by scrapping (retiring the cars from service). Of the empty ACF cars shipped to Granite City between the years 1986 and 1989, 46% were scrapped in 1986, 62% in 1987, 61% in 1988 and 48% in 1989. All the remaining cars in each of those years were returned to lease service.

Characterization of the movements of 22 of ACF's cars, all tank cars or covered hopper cars, is at issue in this case. It is undisputed that:

1. All the cars were moved into storage at Granite City between May 1986 and December 1987. They remained in storage for varying periods ranging between 11 and 578 days.

---

1. Initially Conrail had indicated its intention to file a cross-motion under Rule 56. However, it has instead limited itself to resisting ACF's potentially dispositive motion. More on this subject at the end of this opinion.

2. Rule 56 imposes on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called upon to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Conrail (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

2. At the time of their removal to Granite City, 21 of the cars were coming off lease[3] and one was being moved from another storage facility.

3. All 22 cars were eventually sold for scrap and sent about 10 miles from Granite City to National City, Illinois for scrapping.

ACF traditionally followed certain procedures in its decision whether to scrap cars. First, the ACF Sales Department ("Sales") located in one of several cities identified possible candidates for scrapping from a computer-generated list of cars available for lease. But as indicated by the percentages referred to two paragraphs back, that was not at all equivalent to an affirmative decision to scrap the cars. Instead it could (but did not necessarily) lead to the next step in the decisional process: a recommendatory "scrap" notation made by either Sales or a Representative of the Fleet Operations Department in Earth City, Missouri ("Representative") on the "R" form— shorthand for the "Notice of Transfer" or "Notice of Release" form used to notify that a car was coming off lease.

Each "scrap" recommendation, if one was made, in turn led to a Property Retirement Authorization ("PRA")—a formal recommendation that a car be retired from service, requiring signatures from individuals in three different departments within ACF: Sales, Fleet Operations and Accounting. In addition to the PRA, a physical inspection of the car served several purposes:

1. in the case of a car coming off lease assignment, to determine whether the lessee had subjected the car to more than ordinary wear and tear;

2. to determine what, if any, parts were salvageable; and

3. to ensure that the car was free of hazardous and toxic substances before sending it to Saint Louis Auto Shredding ("SLAS"), the scrap dealer in National City.

That inspection occasionally led to a decision to void the PRA and return the car to lease service. If not, SLAS would dismantle the car and send a notice to ACF confirming the scrapping.

Before any delivery of a car to SLAS for scrapping, the Representative would send a "speed letter" notifying it that the car was coming to it for that purpose. In the case of two of the 22 cars at issue, the Representative sent such a speed letter *before* the car's arrival at Granite City. Such a speed letter is not a binding commitment to scrap the car; its only purpose is as a courtesy to SLAS to enable it to make advance plans for storage of the cars. ACF and Conrail agree that the speed letter itself is not equivalent to a sale.

SLAS would issue a monthly price list to ACF stating what it would pay per-net-ton to ACF for the cars that ACF might scrap that month. SLAS' list was an open purchase quote and was apparently not binding. Based on those prices, the Representative would calculate the scrap car values for the cars that had been authorized for release to SLAS, and Accounting would then send an invoice to SLAS. When SLAS purchased a car from ACF at Granite City, it would pay the freight charges for moving the empty cars between Granite City and National City.

This dispute involves ACF's nonpayment of freight charges for the movement of the 22 empty cars into Granite City. Conrail did not originally bill ACF for those empty car movements. However, the Chicago Regional Office of Compliance and Consumer Assistance ("OCCA") of the Interstate Commerce Commission ("ICC") conducted an investigation, identified the movements as requiring billing and sent Conrail an April 25, 1988 letter (Walsh Aff. Ex. 1) asking that it bill ACF. After ACF refused to pay the charges for those as well as other such movements (290 in all), OCCA brought a complaint against ACF

---

**3.** Reserved for discussion later in this opinion is the question whether the cars were still on lease

upon their arrival in Granite City or had previ-

for the nonpayment of freight charges.[4] On September 11, 1989 Conrail filed its own Amended Complaint with this Court.

### Basic Principles

Both railroad-owned and privately-owned cars make up the national fleet of railroad cars.[5] Movement of empty private rail cars is governed by the National Mileage Tariff, I.C.C. PHJ 6007–I (the "Tariff").[6]

■ Conrail argues that the Tariff does not govern this action. It highlights the application sections that state that the Tariff governs the handling of cars of private ownership "when used by railroads parties to this tariff ... *for transportation over their lines* ..." (Tariff Items 25 & 200, emphasis added by Conrail). Conrail says the cars at issue had been permanently removed from the national fleet and were therefore no longer available for use by the railroad for transportation over the railroad's lines, so that the Tariff does not apply.

But that really assumes the conclusion that Conrail would like this Court to reach—and it is belied by the fact that such large percentages of the cars sent to Granite City were returned to lease service and *not* scrapped. It would be impermissibly artificial to split into two parts ACF's process of (1) shipping cars to Granite City, (2) deciding what disposition to make of the cars stored there and (3) either leasing or scrapping the respective cars—one of those parts being the step of withdrawing the cars "permanently" from the national fleet, the other part represented by undoing that "permanence" by a new lease if (as is so often the case) one is entered into.

And that artificiality is confirmed by the terms of the Tariff itself. Item 190, Section 2.B. of the Tariff, referring to the movement of empty tank cars, states:

> A new car or a newly acquired car moving prior to its first loaded move in commercial service and a car moving for sale or scrap will be moved upon a surrender of a bill of lading and will be subject to applicable rates named in Consolidated Freight Classification and/or in Uniform Freight Classification, or in state classification tariffs where state rates apply, or other applicable tariffs.

Item 615, Part C, Section 2.D. is a similar provision referring to the movement of empty covered hopper cars.

Only the four different movements identified in the preceding paragraph require payment of freight charges under the Tariff. All other empty car movements either move free of charge or are charged in accordance with a separate set of rules legally distinct from the freight charges: the "mileage equalization" rule in the case of tank cars and the "back-to-back empty" rule in the case of covered hopper cars. As for the tank cars, Item 187, Section A.1. provides:

> Should the aggregate empty mileage accumulated by tank cars carrying any of the reporting marks assigned to any one person or company during a calendar year exceed the aggregate loaded mileage during the same calendar year by more than six percent (6%) such excess mileage must be paid for by the person or company to whom the reporting marks are assigned at the rate of thirty-two (32) cents per mile[.]

ously completed their lease assignments. As it turns out, that is really irrelevant.

4.  *United States and ICC v. ACF Industries, Inc.,* No. 88–3482 (S.D.Ill.), filed July 29, 1988. ACF has filed a motion for summary judgment in that action as well, and that motion is fully briefed and awaiting decision.

5.  Private ownership represents over 99% of the total tank cars in the national fleet and approximately 45% of the total covered hopper cars in the national fleet (Association of American Railroads, *Railroad Facts* 47 (1988)).

6.  Conrail claims that it is a party to the Tariff only as it pertains to private tank cars. Movements of all other private cars, such as covered hopper cars, are governed by Conrail's own tariff, I.C.C. CR 9337 (the "Conrail Tariff"). As Conrail admits, the provisions of the Tariff and the Conrail Tariff for covered hopper cars are virtually identical. For the sake of simplicity, this opinion will proceed on the basis of the Tariff and will refer to the Conrail Tariff only when the distinction becomes important.

All empty moves up to the 106% limit are free. As for covered hopper cars, the back-to-back empty rule (Item 615, Part C, Section 2.B.) allows one free empty move for each loaded move. Moves of covered hopper cars to and from repair shops are also free (Item 615, Part C., Section 2.C.). All other empty movements of covered hopper cars are charged 32 cents per mile (Item 615, Part C, Section 2.E.).

To understand the significance of the Tariff's provisions and their application in this case, it is useful to undertake a short diversion into the principles of commerce law underlying the Tariff. Whether or not freight charges apply to a particular empty movement of a privately-owned car traditionally rests on a distinction between movements of the car as "property" (to which freight charges do apply) and movements of the car as an "instrumentality of transportation" (which occur free of charge). In *Union Tank Car Co.—Declaratory Order—Empty Tank Cars*, 358 I.C.C. 688, 691 (1977), ICC illuminated the reason for creating such a distinction:

> As a general proposition, railroads are responsible for maintaining the car fleet necessary to provide rail transportation services. Line-haul revenue is supposed to cover all the costs involved, including the costs of moving empty cars to cleaning and repair stations. Historically, however, tank cars have been owned by shippers and other private car owners rather than by the railroads. Often the empty mileage accumulated by these cars is reasonably related to revenue hauls, such as where a car must be returned empty after carrying a load, or where a car must be transported to a shop for cleaning before picking up another load.

Several years earlier, in *Mileage Allowances, Tank Cars Between Points in the United States*, 337 I.C.C. 23, 31 nn. 9 & 10, 35 (1970) ICC had made it plain that (1) movements before or after a loaded haul, to or from repair shops, to or from facili-

ties for lining, relining or modification, and between shippers for joint use of cars were movements as "instrumentalities of commerce" and not chargeable, while (2) movements of newly acquired, newly constructed or rebuilt cars, as well as movements of empty cars between shippers for sale or scrap, were commercial movements and thus chargeable to the car owner. Describing that decision later, ICC stated in *General American Transportation Corp. v. Indiana Harbor Belt Railroad*, 357 I.C.C. 102, 125 (1977), *aff'd sub nom. Indiana Harbor Belt Railroad v. General American Transportation Corp.*, 577 F.2d 394 (7th Cir.1978) (*"GATCO I"*)[7]:

> The *Mileage Allowance* cases make it clear that the status of a car as an instrumentality of transportation depends upon whether the purpose for which the particular movement in question is made is necessary to produce loaded freight movements and whether the need for the movement arises directly from the transportation function itself.

Phrased differently, if the movement is "solely for the benefit of the car owner and not for revenue purposes" (*Union Tank*, 358 I.C.C. at 692), such as when the empty car is moving for sale or scrap, the car is moving as "property" and the owner bears the burden of freight charges for its movement.

Translation of those principles into tariff form is not straightforward. If rigid application of the "property" v. "instrumentality of transportation" distinction would lead to inequities in the distribution of costs between private car owners and railroads or between railroads, then ICC has seen fit to graft other rules onto the just-outlined principles. Development of the cases on freight charges for repair moves is instructive. More than 40 years ago ICC decided in *Union Tank Car Co., Practices of Carriers Affecting Operating Revenues or Expenses*, 268 I.C.C. 338, 342 (1947) that movements for repair were not movements

---

7. Although *GATCO I* was later overruled by ICC in *General American Transportation Corp. v. Indiana Harbor Belt Railroad,* 3 I.C.C.2d 599 (1987) (*"GATCO II"*), a development that will be addressed a bit later, the current discussion focuses on developing principles. Thus a description of how the *Mileage Allowance* case was seen by ICC is relevant here.

as "property" because the cars were only temporarily withdrawn from transportation service. *GATCO I*, 357 I.C.C. at 127 refined that standard, holding that for a car to be treated as an "instrumentality of transportation" a carrier must derive more than a de minimis economic benefit from the movement or use. ICC there decided that through their overall use of cars in general, railroads derived enough indirect benefit from empty repair movements that such movements should occur free of charge (*id.*). However, ICC also acknowledged in that decision that excess "free" empty movements by private car owners posed a potential problem, and it therefore recommended the adoption via rulemaking of a 105% mileage equalization rule to encourage efficiency and to ensure that private car owners bore the burden of any excessive empty movements (*id.* at 128–29, 135).

Overturning that decision in *GATCO II*, ICC emphasized that proper allocation of economic burdens should take precedence over rigid application of the "instrumentality of transportation" principle. Congressional action was in part the impetus for ICC's shift in emphasis. Both the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4R Act") and the Staggers Rail Act of 1980 call for ICC to encourage efficient pricing and to provide all carriers with a reasonable opportunity to earn adequate revenues (see *GATCO II*, 3 I.C.C.2d at 610–11). Because some carriers were being called on to make a disproportionate number of repair moves and were hence not being benefitted by the equalization rule, ICC decided carriers could file tariffs containing charges for hauling empty privately-owned cars to and from repair facilities. *GATCO II* was decided long after the effective date of the Tariff at issue in this action, so that many of its teachings were not available as of the effective date of the Tariff. Nonetheless, in interpreting the terms of the Tariff this Court recognizes that an aim in drafting a tariff, especially in light of the congressional action, was to be true to the "property" v. "instrumentality of transportation" distinction to the extent that it allocated costs fairly and provided adequate revenue to the railroads.

To return to the Tariff itself as outlined earlier, its provisions clearly mirror the principles as defined in ICC's decisions. Freight charges apply to only four categories of movements—those of a new or newly acquired car before its first commercial loaded move, or of a car moving for sale or scrap—in keeping with ICC's reasoning on what constitutes "property." Mileage equalization rules for tank cars and back-to-back empty rules for covered hopper cars address concerns for excess free empty movements of cars as "instrumentalities of transportation." However imperfectly, the Tariff attempts to strike the proper balance in fairness and the allocation of costs pursuant to ICC's teachings.

Conrail argues that the 22 ACF-owned empty cars, when moving to Granite City from other various points in the country, were either "newly acquired" or "moving for scrap." Under either of those labels freight charges would apply under the terms of the Tariff. This opinion first turns to the argument that the cars were "newly acquired."

### *"Newly Acquired" Cars*

■ This Court may construe the terms of a tariff as a matter of law (*United States v. Western Pacific Railroad*, 352 U.S. 59, 65–66, 77 S.Ct. 161, 165–66, 1 L.Ed.2d 126 (1956)). In that process those terms must be taken in the sense in which they are generally used and accepted, and the tariff must be construed in accordance with that general meaning of the words it uses (*Chicago, Burlington & Quincy Railroad v. United States*, 221 F.2d 811, 812 (7th Cir.1955)). "Newly acquired" cars, as used in the Tariff, refers most obviously and plainly to cars that have changed ownership. Before their first loaded move, such cars are simply commodities changing hands for the sole benefit of their owners and are hence "property" subject to freight charges.

■ Conrail claims that the "newly acquired" category also includes cars that are coming off lease—supposedly they are

"newly acquired" by the owner. Although that is certainly not an obvious or ordinary usage of that term, it is possible that the Tariff's terms may take on added meaning when considered in the context of the general principles discussed earlier.

For instance, in *Atchison, Topeka & Santa Fe Railway v. Union Tank Car Co.*, 611 F.2d 1184, 1190 (7th Cir.1979) our Court of Appeals affirmed ICC's decision in *Union Tank* that tank cars that had been operated in Mexico under lease were "newly acquired" at the time that they returned to the United States, before their first loaded move. Thus freight charges did apply to movements to and from a repair shop upon return of the cars to the United States. There the reasoning turned on an application of the "property" v. "instrumentality of transportation" principles (*id.* at 1189 (citation and footnote omitted)):

> Leasing the cars for use in Mexico interrupted the cars' commitment to the national tank car fleet. The movements from El Paso to the repair and maintenance facilities did not rise "directly from the transportation function," since the need for repairs resulted from use of the cars in Mexico, which produced no revenue for railroads who are parties to the tariff. Union Tank effectively removed its cars from a United States tariff system that generally provides free transportation to repair facilities for private car owners but assumes that such repair work resulted from movements producing revenue to railroad parties to the tariff. Union Tank should not be able to avail itself of the benefits of the system after withdrawing its cars from it. The cars in question could not be treated as instrumentalities of transportation until they had in fact been recommitted to domestic service by moving loaded in the United States.

In that instance ICC clearly stretched the conventional meaning of the term "newly acquired" to cover a unique situation and one that "seems not to have been anticipated by the drafters of the tariff" (*id.*).

By contrast, the commonplace leasing arrangement presented by this case can scarcely be characterized as a unique and unforeseen situation. There is no need to distort the normal meaning of "newly acquired" to extend to an owner of cars who also owned them the day before—the only difference being the expiration of a lease that had run from that same owner to a lessee.

Conrail and ACF expend a large amount of energy in debating whether the 21 cars that were coming off lease were on lease until they reached Granite City or were off lease at some point before. Conrail's argument that the cars were "newly acquired" depends upon the cars having gone off lease at some point before traveling to Granite City. But the premise for Conrail's metaphysical contention is lacking, and this Court need not resolve the parties' dispute in that respect.

For the same reasons that the parties had difficulty in tracking the terms of the leases, the application of the Tariff is not dependent upon whether cars are or are not under lease assignment. Rather, the Tariff's accounting system for mileage allowances depends upon the tracking of "reporting marks"—marks stenciled on the sides of the cars for identification. All reporting marks must be registered with the American Association of Railroads. For accounting purposes the registrant of a car's reporting mark is treated as the owner, whether or not it is in fact, and the registrant receives all of the accounting statements. As happened in this case, the lessor may put its own marks on the car, and the marks will stay the same with a change in lease. If the lessor holds the marks, it has to pass on to the lessee any freight charges incurred while under lease. In short, leases have nothing to do with railroad accounting, and simplicity of railroad accounting methods has everything to do with the payment of freight charges.

Change in marks connotes change in "ownership" for purposes of applying the Tariff. Item 615, Parts B & C, Note 2 provides:

> When a car that has moved in commercial service bearing railroad reporting marks is restenciled with private report-

ing marks, the newly marked car is considered to be a newly acquired car.... Indeed, the very fact that the drafters did not expressly provide for "newly acquired" to mean a change in lease status is perhaps the best evidence that such a definition was *not* intended—and it surely makes sense in the context of the just-described railroad accounting procedures.

Thus even if the leases on ACF's cars had already ended, the cars' movements to Granite City were not the movements of "newly acquired" cars in the contemplation of the Tariff. In the view of the Tariff (as well as in fact) the "owner" did not change, and the empty movements here are treated likewise (Funesti Aff. ¶ 11):

> For example, assume a tank car which is under lease makes a revenue move and then the lease ends at the load destination point, before the car is sent back to the owner or redistributed to a new lessee. That car does not then drop out of the national transportation fleet just because the lease has ended, because the lease has nothing to do with its billing status. Its billing status depends on whether the car is moving as an instrumentality of transportation, which it is if the car is not moving as "property" subject to freight charges.

If the leases on ACF's cars had ended and they were not moving subject to freight charges under the Tariff (that is, "moving for scrap," the issue to be addressed in the next section of this opinion), the cars would be treated by the Tariff exactly as if they had completed a loaded move and were returning empty to their owner in the ordinary course of business. ACF would not get a "free ride" off of those movements, because they would be subject to the equalization and back-to-back empty rules.[8]

As further support for its position, Conrail points to an amendment of the Conrail Tariff effective November 15, 1986, which provided in a note (Conrail Tariff, Item 250–A, Note 3):

> The term "newly acquired car" when used in this tariff is defined as any car that has changed owner and/or operator whether the owner, operator and/or lessor is an individual, firm, corporation or car company including railroad controlled car lines.

Conrail argues that the note applies to the 12 ACF-owned covered hopper cars[9] and that the note defines "newly acquired" as a change from lessee to owner. That argument fails. By its own terms the amendment refers only to "lessors" and not "lessees." Its own reading does not support Conrail's argument but rather follows the plain meaning of "newly acquired" as already explained in this opinion.

This Court finds that the ACF-owned cars were not "newly acquired" as that term is used in the Tariff. It turns now to Conrail's second argument that the cars were "moving for scrap."

### Cars "Moving for Scrap"

ACF does not dispute that the cars were "moving for scrap" between Granite City and National City. SLAS paid the freight charges for that movement. Of course, if the Granite City facility were merely a place used to hold cars before scrapping, it would distort the conceptual underpinnings of the Tariff to rule that the movement toward scrapping began only at that point. If that were so, any car owner could avoid all but the most minimal of freight charges by placing a way station for cars predestined for scrapping a few miles from the scrapping facility and holding the cars there for a short period of time. Only if the Granite City facility served the purpose ACF claims—as the place where ACF made

---

8. Conrail makes a weak attempt to argue that even if ACF does not owe freight charges, mileage equalization charges may apply and ACF has not shown that it does not owe such charges. But Conrail's Amended Complaint refers only to freight charges. Conrail is limited to the issues set out in its Amended Complaint, and ACF need not defend itself against payment of charges other than freight charges.

9. Even apart from the dispositive factor next mentioned in the text, it is debatable which of the cars involved here are covered under the Conrail Tariff amendment, because some cars may have made or were making the movements at issue before the date of the amendment.

its conclusive decisions to scrap the 22 cars—would the facility's existence serve to divide the travel of the empty cars that *were* ultimately scrapped into two legally distinct movements, the first as an "instrumentality of transportation" and the second as "property."

■ Whether the cars were "moving for scrap" is an issue to be determined by a "totality of the circumstances" test. But the very phraseology of the Tariff—its use of the word "for," plainly connoting a movement having the scrapping of the car as its *purpose*—tells us that the search is one for ACF's *intention* in causing the movement to be made. It is precisely because intention is in someone's head and is thus inherently unascertainable by someone else,[10] compounded by the fact that the "intent" of a fictive party such as a corporation poses the added question of which "someone" provides the head to be examined in any event, that the "totality of circumstances" is looked at to provide an objective answer to the inquiry into in-

tent.[11] That view gains credence from ICC's own characterization of OCCA's related claim against ACF. In denying ACF's request for immunity from prosecution, ICC said in *ACF Industries, Inc.—Petition for Exemption*, ICC Decision No. 40194, at 2 (May 1, 1989):

> OCCA claims that ACF knew that cars were to be scrapped prior to their movement to Granite City, and purposefully withheld this information from the line-haul carriers.

Although ICC did not decide the correctness of OCCA's claim in that decision, it demonstrated a great deal of sympathy for OCCA's goals.[12] It must be seen as significant that ICC did not suggest that OCCA had misstated what it needed to prove. Of course this Court realizes that neither ICC's characterization of OCCA's claim nor the nature of that claim—that ACF "purposefully withheld" information—controls here where no *evidence* supports such a claim.

**10.** This Court has frequent occasion to refer to Judge Learned Hand's famous "twenty bishops" aphorism on the closely related subject of the objective principle of contract interpretation (*Hotchkiss v. National City Bank of New York*, 200 F. 287, 293 (S.D.N.Y.1911), *aff'd*, 201 F. 664 (2d Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913)).

**11.** Alternatively this Court could have created a bright-line rule that if a car is ultimately scrapped, thus permanently removing it from the national car fleet, all empty moves toward that end after its final loaded move would be treated per se as movements "for scrap," regardless of ACF's unresolved intent at that earlier time. However, the Tariff certainly does not itself command such a rule, and that rigid an interpretation of "moving for scrap" would seriously bend (if not break entirely) the normal sense of the language employed by the Tariff. This is not to say that if the overwhelming number of moves to Granite City led to the scrapping of cars it would not be appropriate to treat them (indeed to treat *all* moves to Granite City) as presumptively "for scrap"—but that is just another way of saying that the objective facts tell us that was ACF's intent all along. Where as here there is such an even balance in the ultimate fate of the cars sent to the central storage facility in Granite City, no such presumption (let alone any post hoc evaluation) is justified as to the movements *into* that facility.

**12.** ICC there reiterated that its goal under the Rail Transportation Policy of the Staggers Act (49 U.S.C. § 10101a) ("RTP") was to give railroads a realistic opportunity to earn adequate revenues and then stated (*id.* at 5) (citation omitted):
> More importantly, Commission policy under the RTP is clearly contrary to the free transportation of cars. Under the revised Interstate Commerce Act, carriers must be accorded a realistic opportunity to earn adequate revenues. The RTP and Congressional mandates expressed in the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Act encourage the application of separate rates for distinct rail services, demand-based rates and revenue adequacy and discourage cross subsidization and misallocations of costs. The receipt by ACF of extensive free transportation of its private cars to storage facilities does not further these policies.

As a side note, this Court is aware that ICC is encouraging carriers to publish separate rates for "distinct rail services" (see *GATCO II*, 3 I.C.C.2d at 608–10) to further the goals of the RTP. But even if ICC believes that the ACF empty car movements, although not for scrap, should nonetheless be subject to charges (other than the equalization and back-to-back empty rates, which might also have allowed for the moves to go uncharged), this Court must be faithful to the present terms of the Tariff, which do not provide for such separate rates.

**944**

Not surprisingly, a closely analogous situation in commerce law also looks to intent—this time that of the shipper. Whether the transportation between two points within a single state is to be characterized as interstate or intrastate depends on the essential character of the shipment involved (*Texas & New Orleans Railroad v. Sabine Tram Co.*, 227 U.S. 111, 126, 33 S.Ct. 229, 234, 57 L.Ed. 442 (1913)). In turn, the character of a shipment is a function of "the shipper's fixed and persisting intent at the time of shipment" (*Armstrong World Industries, Inc.—Transportation within Texas*, 2 I.C.C.2d 63, 69 (1986)). Whether the shipper has the requisite intent depends upon the totality of the facts and circumstances (*Southern Pacific Transportation Co. v. ICC*, 565 F.2d 615, 617 (9th Cir.1977), citing *Southern Pacific Transportation Co.—Investigation of Operations*, 120 M.C.C. 236, 242 (1974)). And to that end the determination must be made at the time the commodity is tendered (*Mid America Milling Co. v. Alton & Southern Railroad*, 308 I.C.C. 685, 688 (1959)).

*Burlington Northern, Inc. v. Weyerhaeuser Co.*, 719 F.2d 304 (9th Cir.1983) is an interstate commerce case so similar to this case that it illustrates the usefulness of the analogy. There the Ninth Circuit found the shipper did not have a "fixed and specific intent" to export logs interstate at the time they were shipped to an inland sort yard in Tacoma, even though the shipper knew that the vast majority of the logs at the yard would ultimately be exported. Because quality assessments were made at the yard as to each log, Weyerhaeuser's marketing manager accurately said that "No log that is sent to Tacoma is irrevocably committed to a specific end use at the time it is shipped from the woods" (*id.* at 307). Thus the court decided that the movements to the inland sort yard were "separate and distinct from the ultimate transportation to a final destination" (*id.* at 310).

It is not a far stretch to analogize the 22 cars in this case to a "shipment." After all, it is Conrail's contention that the cars were commodities—freight traveling on its own wheels. Whether the cars were "property" that was "moving for scrap" or were instead "instrumentalities of transportation" simply returning to storage after a loaded haul may fairly be controlled by whether ACF really intended to scrap the 22 cars *before* their arrival in Granite City.

■ But this Court need not espouse the "fixed and specific intent" notion in its ultimate sense to decide this case. That would lay the way open to a purely cosmetic use of a facility such as Granite City to escape all charges even though (say) 90% of the cars sent there really ended up on the scrap heap. Rather it suffices to hold that it would be enough for Conrail to prove by a "totality of the circumstances" test that ACF had effectively committed the cars for scrap before their arrival in Granite City.[13] Focus must be on the point at which ACF may be objectively viewed as having *committed* a car for scrap, so that movements at a distance from the time and place of scrapping are not pegged as movements "for scrap" simply because ACF had decided that a car should be evaluated for that purpose (or had later resolved that evaluation in favor of scrapping).

ACF argues that the cars were still under lease, so that the lessees were the shippers for the purposes of determining "shipper's intent"—and *they* certainly did not have the intent to scrap the cars. Such a formalistic adoption of the interstate commerce analogy would be absurd. Here the proper inquiry remains *ACF's* intent *because of* (rather than in spite of) the fact that only ACF as owner of the cars could make the decision to scrap them.

To be sure, the existence of a lease is not irrelevant as part of a determination of the totality of the circumstances surrounding the movements. For instance, if a car were under lease coming into Granite City, that might be one factor showing it less

**13.** In the present Rule 56 context, of course, Conrail need not *prove* that at all. It could defeat an adverse summary judgment by identifying a genuine issue of material fact after it had received the benefit of all reasonable factual inferences (see n. 2).

likely that the cars were moving for scrap than that they were returning empty in the normal course of business hauls. But existence of the lease is not determinative. Simply because a car is on lease assignment does not mean it cannot also be moving for scrap. Were the latter to be the case, a lessor could avoid freight charges for movement for scrap by designating the scrapyard as the "mutually agreed upon location" for car return whenever it had already decided to scrap a car following lease termination.

Because the most that the existence of an ongoing lease might do is to suggest that it would be less likely that ACF was moving its cars for scrap, the leasing situation would be a material (that is, outcome-determinative) fact only if ACF would not prevail on the question of its pre-Granite City intent if the cars were *not* then on lease. And because ACF wins on that issue, this opinion is not compelled to solve the puzzle posed by the lease documents as tendered by the parties.[14]

Even with the benefit of reasonable inferences, Conrail cannot escape the conclusion that ACF is right in its contention that the cars were sold, and thus committed, for scrap only *after* their arrival in Granite City. That conclusion is compelled by ACF's regular procedures, under which the PRA and inspection were prerequisites to scrapping, coupled with the fact that about half the cars sent to Granite City were and the other half were not ultimately consigned to that fate. Granite City's status as a bona fide centrally-located storage facility for cars coming off lease is not vitiated by Sales' identification of some such cars as potential candidates for scrapping before the cars' arrival in Granite City.

In sum, this Court cannot buy Conrail's counterargument that the inspection and PRA were simply formalities upon the cars' arrival at Granite City and that the cars were committed for scrap before such arrival. Any such notion of predestination is at war with the facts, and it cannot prevail.

■ There is one obvious exception to that conclusion. As to two cars the trip to Granite City was *preceded* by a speed letter to SLAS. That uncontrovertibly reflects an intent on ACF's part to move those cars there "for scrap." ACF cannot have it both ways by saying that in such an instance a *later* decision to reverse that fate can somehow trump the original intent.

### Conclusion

There are really no genuine issues of material fact as to whether the 22 ACF-owned cars were "moving for scrap" and are thus subject to freight charges under Item 190, Section 2.B. of the Tariff for tank cars and Item 615, Part C, Section 2.D. of the Tariff (or its identical provision in the Conrail Tariff) for covered hopper cars. All but two of those cars *were not* moving for scrap, while the other two *were*.[15] Accordingly it is ordered that final judgment be entered in favor of Conrail and against ACF in the sum of $2,488.59 (based on $1,251.90 in freight charges as to Car No. 24627 and $1,236.69 in freight charges as to Car No. 90443), and in all other respects judgment is ordered entered in favor of ACF and against Conrail dismissing Conrail's claims.

---

14. Thank goodness that is so. This Court nonetheless found itself forced to wander through the impenetrable maze presented by the leases and by the contrasts between their literal provisions and what seemed to be happening in real life. If this case had to depend on the answers provided there, it would have been necessary to face the fact that the documentation provided about as many questions as answers.

15. It is true that Conrail did not follow up on its originally-announced intention to seek its own summary judgment (see n. 1). Cross-motions under Rule 56 demand a Janus-like perspective, with factual inferences drawn in opposite directions on the two motions. In this instance ACF cannot escape its own contemporaneous characterization of the movement of the two cars, so that a final resolution in Conrail's favor is appropriate in that respect.